FILED

AUG 1 6 2010

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

| | |
|---|---|
| JOSEPH T. COLEMAN, | ) |
| | ) |
| *Plaintiff,* | )    Civil Action No.: 2:10cv403 |
| | ) |
| v. | ) |
| | ) |
| TYSON FARMS, INC., | ) |
|    SERVE: CT Corporation System | ) |
|        4701 Cox Road, Suite 301 | ) |
|        Glen Allen, VA 23060 | ) |
| | ) |
| *Defendant.* | ) |

## COMPLAINT

Plaintiff, Joseph T. Coleman ("Mr. Coleman"), through counsel, files this Complaint against his former employer, Tyson Farms, Inc. ("Tyson") for its improper and illegal termination of his employment. Mr. Coleman asserts federal claims pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000(e), and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, and asserts a claim under the common law of Virginia for breach of contract. Mr. Coleman seeks awards of compensatory damages, punitive damages, and attorneys' fees and costs.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to 28 U.S.C. §1331 in that this action asserts violation of rights secured by laws of the United States, specifically, Title VII and the FMLA.

2.      Venue is proper in this Court in accordance with 28 U.S.C. § 1391(b), as this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

3.     This Court has supplemental jurisdiction over plaintiff's breach of contract claim pursuant to 28 U.S.C. § 1367.

## PARTIES

4.     Mr. Coleman is a resident of Marion Station, Somerset County, Maryland.  He was, at all relevant times, employed by Tyson at its poultry processing plant in Temperanceville, Accomack County, Virginia.

5.     Tyson is one of the world's largest processors and marketers of chicken, beef, and pork and provides products and services to customers throughout the United States.  Tyson's principal place of business is in Springdale, Arkansas.  Tyson has a poultry processing plant located in Temperanceville, Virginia at which Mr. Coleman worked for ten and one-half years.

## FACTS COMMON TO ALL COUNTS

6.     The facts alleged above are incorporated by reference.

7.     Mr. Coleman began working in Tyson's Temperanceville plant in 1999.  During the ensuing decade, Mr. Coleman received uniformly excellent evaluations, was promoted for his hard-work and dedication to the company, and maintained a clean disciplinary record.

8.     In October of 2008, Tyson promoted Mr. Coleman to day-shift Maintenance Supervisor from the position of Production Supervisor.  At around that same time, Mr. Coleman's wife, Tracy Coleman ("Mrs. Coleman"), learned that she was pregnant.  Like Mr. Coleman, Mrs. Coleman worked in Tyson's Temperanceville plant and also had been with the company since 1999.  At the time of her pregnancy, Mrs. Coleman had risen to the rank of Night Human Resources Manager.  Mr. and Mrs. Coleman were ecstatic with the news of Mrs.

Coleman's pregnancy. The couple had been trying to conceive for some time and had suffered a terrible loss when Mrs. Coleman had a miscarriage in April of 2008.

9.     Mrs. Coleman experienced complications during her second pregnancy, including pre-term labor. For this reason, Mr. Coleman had arranged to use his accumulated "comp time" to take a leave of absence to help care for his wife and child after the baby's delivery.

10.     Mr. Coleman, like other Tyson employees, was paid a salary based upon a forty-hour work week. When Mr. Coleman worked a sixth or seventh day during a week, he accumulated "comp time," as he was not paid for hours worked in excess of forty hours. For every ten hours worked, Mr. Coleman received one "comp" day.

11.     In January of 2009, Mr. Coleman informed his supervisor, Matthew Mason ("Mr. Mason") and the Director of Human Resources, Hector Velez ("Mr. Velez"), that he planned to use his "comp time" to take a leave of absence after the birth of his child. Initially, Mr. Mason and Mr. Velez supported Mr. Coleman's decision to take a leave of absence. Mr. Mason or Mr. Velez instructed Mr. Coleman to submit an absence request form when his wife's delivery date was determined. No one on behalf of Tyson informed Mr. Coleman his absence qualified for leave under the FMLA or was subject to FMLA protection.

12.     Mrs. Coleman was scheduled for delivery on July 17, 2009 based upon her medical needs and the availability of Mrs. Coleman's doctor. Mr. Coleman promptly submitted the absence request forms to Mr. Mason, as he now knew, with certainty, the date of delivery. Mr. Mason approved Mr. Coleman's request for a four-week leave of absence, which was scheduled to end on August 14, 2009.

13.     Mr. Coleman's daughter was born on July 17, 2009. Mr. Coleman was present for the birth and was thrilled to stay home and care for his wife and daughter. Midway through

his leave, Mr. Coleman returned to work for three days, as had originally been agreed by the parties, in light of Mr. Mason's previously planned vacation.  When Mr. Mason returned from vacation he demanded that Mr. Coleman return to work and forfeit the remainder of his approved leave, despite the fact that Mr. Mason had granted Mr. Coleman a leave of absence until August 14.

14.    As a result of Mr. Mason's unequivocal demand, on August 4, 2009, Mr. Coleman applied for FMLA leave.  Mr. Coleman had planned on being home to care for Mrs. Coleman and their daughter; but, because Tyson was now refusing to allow Mr. Coleman to use his "comp time," he believed his only alternative was to request FMLA leave.  Mr. Velez and Plant Manager, Brady Wilson, had prophesied that Mr. Coleman would not take FMLA leave and told him so in no uncertain terms:  Because Mrs. Coleman was also a Tyson employee, the aggregate number of weeks to which both were entitled for FMLA leave was limited to twelve weeks in a twelve month period and, according to Mr. Coleman's superiors, Mr. Coleman would not want to take time away from his wife.  Mr. Coleman apparently shocked and frustrated Mr. Mason when he applied for FMLA leave.  Tyson approved Mr. Coleman's request (albeit reluctantly and because Mr. Coleman was clearly entitled to his request for leave under FMLA).  The approval, however, did not come without conditions.  Mr. Coleman was ordered to forfeit the remainder of his "comp time," as a prerequisite for being allowed to take FMLA leave.

15.    Mr. Coleman was granted leave until Friday, August 14, 2009.  On Monday, August 17, 2009, Mr. Coleman returned to work.  Just four days later, Mr. Coleman received an e-mail from Mr. Mason stating that he had failed to "follow up" on United States Department of Agriculture ("USDA") "issues" and that, if prolonged, his failure would be "detrimental" to his employment status.  Mr. Coleman responded to Mr. Mason *via* e-mail, confirming that the

alleged "issue" had apparently gone unaddressed for the one month he had been on leave (because he was not working) and that, as soon as he returned to duty and learned of the problem, he had begun to work on a solution. No reprimands were given to anyone else on day- or night-shift for their failure to address these perceived USDA "issues," in Mr. Coleman's absence, and that had remained unaddressed for the entire month Mr. Coleman was on leave.

16.    Less than one week later, Mr. Coleman received his first "disciplinary action notification." The Maintenance Superintendent, Barbara McCool ("Ms. McCool"), issued Mr. Coleman the disciplinary action notice without justification and without the authority to do so. The Safety Manager, Sonia Williamson ("Ms. Williamson"), was the only manager authorized to issue a disciplinary action notification for safety violations at Tyson's Temperanceville facility. Ms. Williamson found that the disciplinary action notification issued to Mr. Coleman by Ms. McCool was not warranted because the alleged violation occurred prior to the beginning of Mr. Coleman's shift, and Ms. Williamson immediately removed the disciplinary action notification from Mr. Coleman's personnel file.

17.    On October 16, 2009, Mr. Coleman received his first written warning in his ten years of employment with Tyson, for allegedly failing to develop a check sheet in a timely fashion. The purpose of the check sheet was to prevent a repeat of a deviation that occurred on the night-shift (not Mr. Coleman's shift) on Friday, October 9. Mr. Coleman was instructed *via* e-mail at 9:42 a.m. on Monday, October 12 to create a "check sheet" with no instruction or imposed deadline. Mr. Coleman immediately began to work on developing the check sheet in between completing all other assigned duties and finished the check sheet later that day. According to Mr. Mason, Mr. Coleman did not create the check sheet in a timely fashion and,

therefore, committed a "serious" offense. However, it took five days for Mr. Mason to issue to Mr. Coleman the written warning for this allegedly "serious" infraction.

18.     One week later, Mr. Coleman received a second written warning for failing to report to work on his birthday, October 22. Pursuant to Tyson's "Recognized Holidays and Compensation" Policy, an employee's birthday is a recognized, automatic holiday. Mr. Coleman had informed Mr. Mason one month in advance that he would be taking off from work on October 22 under the Policy. Mr. Coleman also told Ms. McCool two weeks prior to October 22 that he would not be reporting to work on his birthday. On October 21, two hours before his shift was set to expire, Mr. Coleman reminded Ms. McCool that he was exercising his rights under the Policy and that he would not be reporting to work on the next day. Ms. McCool then informed Mr. Coleman, for the first time, that, if he did not report to work, he would be "written up." Mr. Coleman had already made plans for his birthday, and, so, he told Ms. McCool that he could not report to duty on October 22. Even though Mr. Coleman had given his supervisor one month's notice that his birthday was on October 22 and that he would be taking the day off under the Policy, he told Ms. McCool that he would accept "one instance" for his "unexcused" absence, as permitted by company policy.   Under Tyson's "Management Attendance Guidelines," four instances of absence results in an attendance notification, and eight instances of absence in a twelve month period results in termination. Within the last year, Mr. Coleman had not received an "instance" and, therefore, he believed he could not be "written up" under the circumstances.

19.     Mr. Coleman returned to work on Friday, October 23 and worked the day without incident. He was not reprimanded or disciplined for taking off from work on his birthday. On Saturday, October 24, Mr. Coleman was scheduled off from work. While at home

that Saturday, at approximately 1:15 p.m., Mr. Coleman received a call from Ms. McCool questioning why he had failed to report for duty. Mr. Coleman reminded Ms. McCool that he was scheduled off from work. Ms. McCool alleged, however, that all supervisors had been informed in a "meeting" or by "e-mail" that it was "mandatory" to work on that weekend. Neither Mr. Coleman, nor the other supervisors had, in fact, received notice or correspondence that they were required to work on that Saturday.

20.    As scheduled, Mr. Coleman arrived to work on Monday, October 26. After working seven hours, Mr. Coleman was issued a written warning by Ms. McCool for failing to report to work on his birthday. According to the written warning, Mr. Coleman had been informed "three weeks prior that no time off would be scheduled that week due to Corporate Rep being here and [Mr. Mason] being on vacation." Conversely, in an e-mail written by Ms. McCool to Mr. Velez dated October 22, 2009, Ms. McCool claimed she was unable to approve Mr. Coleman's leave because one supervisor was on medical leave and a second shift supervisor had stepped down to the position of maintenance mechanic. However, the supervisor who was allegedly "out sick" worked the night-shift in a different department and returned to work on October 22.

21.    After issuing the written warning on October 26, 2009, Ms. McCool informed Mr. Coleman that he had been placed on administrative leave without pay for one week. Apparently, Mr. Coleman had been placed on administrative leave "pending record review" because he had failed to report to work on his birthday (October 22) and October 24, although Mr. Coleman had not previously received a written warning for his alleged failure to report to work on October 24, 2009.

22.    On Monday, November 1, Mr. Coleman was prepared to report to work after his five-day administrative leave, but was told "they were not ready for him to come back." Mr. Coleman returned to work on November 2 and received a disciplinary letter providing, "As of 11/2/2009 you are being discharged from your position for insubordinate behavior, as it pertains to your presence in the facility after being informed in the presence of several other managers that no one was to be off the week of October 18 through October 25."

23.    In a timely fashion, Mr. Coleman filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging sex discrimination.  The EEOC issued a "Right-To-Sue" letter on June 17, 2010; a copy of which is attached hereto as **Exhibit A.**

## CAUSES OF ACTION
## COUNT I
### TITLE VII (Gender Discrimination – Disparate Treatment): 42 U.S.C. §2000e

24.    The facts alleged above are incorporated by reference.

25.    Mr. Coleman was intentionally discriminated against by his employers because he is male and elected to stay home and care for his baby, a "traditionally" female duty.  As alleged above, Mr. Coleman was "singled out" and treated less favorably than others similarly situated because of his gender.

26.    Mr. Coleman's gender was a motivating factor in his employers' adverse employment actions.  Although Mr. Coleman and his wife both took a leave of absence from work for the birth of their child, Mrs. Coleman did not face discriminatory or retaliatory measures upon returning to work, because she is female.  At no point was Mrs. Coleman ordered to return to work during her leave of absence, and/or forfeit her "comp time" as part of her

taking FMLA leave.  There have been no other instances in which a female Tyson's employee has been required to return to work early after being granted a leave of absence for the birth of a child.  Tyson's paradoxical treatment of Mr. Coleman and Mrs. Coleman illustrates that Tyson treats female employees more favorably in granting leave of absences and in foregoing retaliatory actions when female employees return to work.  As a direct and proximate result of Tyson's violation of law, Mr. Coleman has incurred and will continue to incur economic damages, including lost pay and job benefits, together with severe emotional distress accompanied by physical symptoms.

## COUNT II:
## (FMLA – Retaliation) 29 U.S.C. §2601 *et seq.*

27.    The facts alleged above are incorporated by reference.

28.    Mr. Coleman was retaliated against by Tyson for taking protected FMLA leave. Mr. Coleman's termination was temporally close to the expiration of his protected FMLA leave and the impartial and unfair treatment leading up to his termination casts doubt on the fairness of his employer's actions.  Tyson's willful violation of the FMLA proximately caused Mr. Coleman to incur the damages alleged, above.

## COUNT III:
## Breach of Implied Contract

29.    The facts alleged above are incorporated by reference.

30.     Tyson entered into an implied contract with Mr. Coleman based upon the parties'
understanding and intent reflected and memorialized in policies and procedures provided to Mr.
Coleman and other similarly situated employees of Tyson.

31.     Tyson breached material terms of the parties' implied contract causing significant
damage to Mr. Coleman.  Tyson breached its policies and procedures in an effort designed to
culminate in Mr. Coleman's improper and illegal termination.

32.     Tyson's "Harassment/Discrimination Policy" provides that "It is the policy of
[Tyson] to provide a work environment that is free from unlawful harassment and discrimination.
We will maintain a strict policy prohibiting any kind of unlawful harassment. . . This policy sets
forth guidelines for maintaining a work environment that is free of any form of unlawful
harassment and/or discrimination by anyone in the workplace to include managers, supervisors,
co-workers vendors, clients or customers of [Tyson]."   Mr. Coleman's supervisors and the
Human Relations Manager perpetuated and acquiesced in the discriminatory practices against
Mr. Coleman and fostered a hostile work environment.  By failing to provide Mr. Coleman with
a work environment that is free from unlawful discrimination, Tyson breached its Harassment
and Discrimination Policy causing undue damage to Mr. Coleman.

33.     Tyson breached its "Recognized Holidays and Compensation" policy, which
provides that the policy "is designed to ensure consistent practices with respect to both holiday
eligibility and compensation."  According to the policy, there are eight recognized holidays at
Tyson, including "birthday or date designated by location manager."   Tyson breached the
Recognized Holidays and Compensation policy by ordering Mr. Coleman to work on his
birthday (October 22) even after Mr. Coleman had given his supervisor one month's notice that
he would be taking off from work on his birthday pursuant to the policy.  Nevertheless, Ms.

McCool perpetuated her discriminatory and retaliatory animus against Mr. Coleman by scheduling Mr. Coleman to work on an observed holiday, without reason or justification, and then used Mr. Coleman's absence from work as grounds for termination.

34.     Tyson breached its "Management Attendance Guidelines" when it unfairly disciplined Mr. Coleman for taking off from work on his birthday.   According to the Management Attendance Guidelines, an "absence" is defined as "all days missed for any reason except those defined as excused absences."   An "excused absence" is defined as "instances excused in advance by the Team Member's supervisor, [sic] Absences protected by the Family and Medical Leave Act, or excused by other Company policy (e.g. Jury Duty, Leave of Absence, Vacation, Holidays, Bereavement).   These absences do not accrue instances."   Even if Mr. Coleman's birthday was not a recognized, automatic holiday under Tyson's Recognized Holidays and Compensation policy, his one absence from work, under the Management Attendance Guidelines, results in one "instance."   An "instance" is defined as "one or more consecutive days of absence not listed as an excused absence."   According to the Management Attendance Guidelines, eight instances results in termination.   Mr. Coleman had not received any "instances" during the calendar year; yet, Mr. Coleman was placed on administrative leave for having received just one instance (assuming Mr. Coleman's absence from work on his birthday was deserving of an instance).

35.     Tyson's discriminatory and retaliatory animus is evident through its failure to adhere to its very own policies and procedures.   Tyson breached its implied contract with Mr. Coleman because Mr. Coleman is male and elected to take protected leave to care for his wife and child after the delivery of his baby, thus proximately causing him to incur the damages alleged, above.

### JURY DEMAND

Pursuant to Rule 38(d), Plaintiff demands trial by jury on any issue triable as of right by a jury.

### CLAIMS FOR RELIEF

Mr. Coleman asks this Honorable Court to grant the following relief:

A.      Enter an award of compensatory and punitive damages in favor of Plaintiff and against Defendant for its violation of Title VII;

B.      Enter an award of damages in favor of Plaintiff and against Defendant for its violation of the FMLA in the amount of any wages, employment benefits, or other compensation that the plaintiff lost as a result of termination and liquidated damages equal to twice the sum of his total economic loss;

C.      Enter an injunction commanding Defendant to reinstate Plaintiff or, in the alternative, to compensate him for his lost future wages or "front pay;"

D.      Enter an award of back pay, adding to that figure the value of any other fringe benefits that Plaintiff has lost, including the value of his lost "comp time;"

E.      Enter an award of damages in favor of Plaintiff and against Defendant for Defendant's breach of material terms of the parties' implied contract;

F.      Award reasonable attorneys' fees and costs of suit in favor of Plaintiff and against Defendant;

G.      Grant Plaintiff such other and further relief as the nature of his cause may warrant.

August 13, 2010.                    JOSEPH T. COLEMAN

Edward Everett Bagnell, Jr. (VSB No. 74647)
Email:  ebagnell@spottsfain.com
SPOTTS FAIN PC
Post Office Box 1555
411 East Franklin Street, Suite 600
Richmond, Virginia  23218-1555
Telephone:  (804) 697-2000
Facsimile:  (804) 697-2100
*Counsel for Defendant Joseph T. Coleman*

Of Counsel:
Robin R. Cockey, *Pro Hac Vice* pending
Ashley A. Bosché, *Pro Hac Vice* pending
Cockey, Brennan & Maloney, P.C.
313 Lemmon Hill Lane
Salisbury, Maryland 21801
Telephone:  (410) 546-1750
Facsimile:  (410) 546-1811
rresq@cbmlawfirm.com
bosche@bcmlawfirm.com